UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x

RUBEN PABON & SYLVESTER ROBERTS,

                                         Plaintiffs,      **COMPLAINT AND JURY DEMAND**

       -against-

CITY OF NEW YORK, POLICE OFFICER MOHAMED      **Docket No.**
MOHAMED # 18337, POLICE OFFICER JAMES PARIS,
OFFICERS JOHN DOE #1-5,

                                         Defendants.

------------------------------------------------------------------- x

      Plaintiffs Ruben Pabon and Sylvester Roberts, by their attorney Amy Robinson, of Stoll, Glickman & Bellina, LLP, for their Complaint alleges as follows:

## PRELIMINARY STATEMENT

1. This is a civil rights action in which Plaintiffs seek relief through 42 U.S.C. § 1983 for violations of their Fourth and Fourteenth Amendment rights, in addition to violations of the laws and Constitution of the State of New York.

2. The claim arises from a July 9, 2014 incident in which officers of the New York City Police Department ("NYPD"), acting under color of state law, intentionally and willfully subjected Plaintiffs to, among other things, false arrest and excessive force.

3. Plaintiffs seek monetary damages (special, compensatory, and punitive) against Defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION & VENUE

4. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988 and the laws and Constitution of the State of

New York.

5. The jurisdiction of this court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1367(a) and the doctrine of pendent jurisdiction.

6. Venue is laid within the Eastern District of New York in that Defendant City of New York is located, and a substantial part of the events giving rise to the claim occurred, within the boundaries of the Eastern District.

## PARTIES

7. Plaintiff RUBEN PABON resided at all times here relevant in Kings County, City and State of New York.

8. Plaintiff SYLVESTER ROBERTS resided at all times here relevant in Kings County, City and State of New York.

9. The City of New York ("City") is a municipal corporation organized under the laws of the State of New York. At all times relevant hereto, Defendant City, acting through the NYPD, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, discipline and retention and conduct of all NYPD personnel. In addition, at all times here relevant, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that the NYPD personnel obey the laws of the United States and the State of New York.

10. Police Officers MOHAMED MOHAMED and JAMES PARIS were, at all times here relevant, police officers of the NYPD, and as such were acting in the capacity of agents, servants and employees of the City of New York. On information and belief, at all times relevant hereto, Officers Mohamed and Paris were involved in the decision to seize Plaintiffs without probable cause or failed to intervene in the actions of their fellow officers when they observed them

2

seizing Plaintiffs without probable cause. Officers Mohamed and Paris are sued in their individual capacities.

11. Police Officers John Doe #1-5, whose identities are currently unknown to Plaintiffs, were, at all times here relevant, police officers of the NYPD, and as such were acting in the capacity of agents, servants and employees of the City of New York. On information and belief, at all times relevant hereto, defendant officers were involved in the decision to arrest Plaintiffs without probable cause or failed to intervene in the actions of their fellow officers when they observed them arresting Plaintiffs without probable cause. On information and belief, at all times relevant hereto, defendant officers were under the command of the 79th Precinct and/or the Public Service Area 3 housing bureau and are sued in their individual capacities.

12. At all times here mentioned Defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## NOTICE OF CLAIM

13. Within 90 days of the events giving rise to this claim, Plaintiffs filed written Notices of Claim with the New York City Office of the Comptroller. Over 30 days have elapsed since the filing of the Notices, and this matter has not been settled or otherwise disposed of.

## FACTUAL ALLEGATIONS

14. On July 9, 2014, at approximately 12:45 A.M., shots were fired near 991 Myrtle Avenue in Brooklyn. Plaintiffs were in no way involved with or connected to the shooting.

15. Upon information and belief, NYPD officers Mohamed Mohamed, James Paris, and Lieutenant John Doe, whose true name is currently unknown by Plaintiffs, were in a marked police car near 991 Myrtle Avenue.

16. At that same time, Sylvester Roberts was walking on Broadway near Fayette Street. He was committing no crime and had not violated any laws or regulations.

17. As he walked down the street, Mr. Roberts heard a loud noise and immediately saw a group of young men running in his direction. Scared, Mr. Roberts started running, too.

18. Suddenly, police officers tackled Mr. Roberts from behind, forcibly bringing him to the ground. As Mr. Roberts was lying chest-down on the sidewalk, the officers dragged him to a parked patrol car and placed him under arrest.

19. As a result of being dragged across the concrete, Mr. Roberts suffered abrasions to his stomach, face, and nose.

20. Police officers took Mr. Roberts to Public Service Area ("PSA") 3, an NYPD housing bureau on Central Avenue.

21. Officers strip-searched Mr. Roberts and recovered no contraband.

22. Meanwhile, also at approximately 12:45 A.M. on July 9, 2014, Ruben Pabon was on Broadway between Ellery Street and Park Street, walking toward his grandmother's house. He was committing no crime and had not violated any laws or regulations.

23. Mr. Pabon heard gunshots and saw lots of people on the street running.

24. Police officers stopped Mr. Pabon and placed him against the wall.

25. The officers accused Mr. Pabon of running. Mr. Pabon pointed out that a lot of people on the street were running.

26. One of the police officers told Mr. Pabon: "you're done."

27. Officers placed Mr. Pabon under arrest and escorted him to the 79th Precinct. Shortly thereafter, they took him to PSA 3. Police officers strip-searched him and did not recover any contraband.

28. At PSA 3, Plaintiffs were placed in a cell with another individual who had been apprehended.

29. Plaintiffs heard the other man admit to the police that the gun they had recovered near the scene of the shooting was his.

30. NYPD Detectives questioned Plaintiffs individually at the police station. Plaintiffs truthfully told the police that they had nothing to do with the shooting.

31. Plaintiffs were held at the police station all night and all day.

32. At approximately 8:00 P.M. on July 9, 2014, Plaintiffs were taken to Brooklyn Central Booking.

33. At approximately 11:30 P.M., Mr. Pabon was informed that the Kings County District Attorney's Office had declined to prosecute him and that he was free to leave.

34. At approximately 1:00 A.M. on July 10, 2014, Mr. Roberts was informed that the Kings County District Attorney's Office had declined to prosecute him and that he was free to leave.

35. At all times during the events described above, the defendant police officers were engaged in a joint venture and formed an agreement to violate Plaintiffs' rights. The individual officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during said events. They failed to intervene in the obviously illegal actions of their fellow officers against Plaintiffs.

36. During all of the events above described, Defendants acted maliciously and with intent to injure Plaintiffs.

## DAMAGES

37. As a direct and proximate result of the acts of Defendants, Plaintiffs suffered the following injuries and damages:

   a. Violation of their rights pursuant to the Fourth Amendment of the United States Constitution to be free from an unreasonable search and seizure of their persons;

   b. Violation of their rights pursuant to the Fourteenth Amendment of the United States Constitution to due process;

   c. Violation of his New York State Constitutional rights under Article 1, Section 12 to be free from an unreasonable search and seizure;

   d. Violation of his New York State Constitutional rights under Article 1, Section 6 to due process;

   e. Physical pain and suffering;

   f. Emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, extreme inconvenience, anxiety; and

   g. Loss of liberty.

## FIRST CAUSE OF ACTION
42 U.S.C. § 1983
FALSE ARREST

38. The above paragraphs are here incorporated by reference.

39. The officer defendants wrongfully and illegally arrested, detained, and imprisoned Plaintiffs.

40. The wrongful, unjustifiable, and unlawful apprehension, arrest, detention, and imprisonment of Plaintiffs was carried out without a valid warrant, without Plaintiffs' consent, and without probable cause or reasonable suspicion.

41. At all relevant times, Defendants acted forcibly in apprehending, arresting, and imprisoning Plaintiffs.

42. All of this occurred without any illegal conduct by Plaintiffs.

43. The Kings County District Attorney's Office declined to prosecute Plaintiffs.

44. Defendants acted under color of law and conspired to deprive Plaintiffs of their civil, constitutional, and statutory rights to be free from unreasonable search and seizure and to due process of law pursuant to the Fourth and Fourteenth Amendments to the United States Constitution and are liable to Plaintiffs under 42 U.S.C. § 1983.

45. Plaintiffs have been damaged as a result of Defendants' wrongful acts.

**SECOND CAUSE OF ACTION**
42 U.S.C. §1983
EXCESSIVE FORCE
(As to Plaintiff Roberts)

46. The above paragraphs are here incorporated by reference.

47. By using excessive force against Plaintiff Sylvester Roberts, and failing to intervene on behalf of one another's unlawful and unconstitutional conduct, Defendants deprived Mr. Roberts of his rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. §1983, including, but not limited to, rights guaranteed by the Fourth Amendment to the United States Constitution.

48. The officer defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their respective employment as NYPD officers. Said acts by officer defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly and with the specific intent to deprive Plaintiffs of their constitutional rights secured by the United States Constitution.

49. As a direct and proximate result of the misconduct and the abuse of authority detailed above, Plaintiff Sylvester Roberts sustained the damages described above.

## THIRD CAUSE OF ACTION
### 42 U.S.C. §1983
### SUPERVISORY & MUNICIPAL LIABILITY

50. The above paragraphs are here incorporated by reference.

51. The above paragraphs are here incorporated by reference.

52. The City is liable for the damages suffered by Plaintiffs because, after learning of its employees' violations of New Yorkers' constitutional rights, the City has: failed to remedy the wrong; created a policy or custom under which unconstitutional practices regularly occur and even thrive; and has been grossly negligent in managing subordinates who cause the unlawful events. The result of the City's inaction is a culture within the NYPD where the same officers, the same units, and the same precincts repeatedly and routinely engage in acts of misconduct. By failing to properly train, supervise, and discipline its employees, agents, and servants, the City effectively encourages illegal, immoral, and unprofessional behavior.

53. On numerous occasions over the span of many years, the City of New York has been alerted to the regular use of excessive force and the frequency of false arrests charges brought by its police officers. Despite having acquired such knowledge, the City has refused to appropriately sanction its employees' illegal behavior.

54. The City's deliberate indifference to civil rights violations committed by individual police officers, as well as patterns of misconduct committed by the same officers or occurring in the same precinct has caused the constitutional violations against Plaintiffs in this case.

**THE CITY FAILS TO TRACK LAWSUITS, THEREBY SEVERING ANY POTENTIAL DETERRENT VALUE OF CIVIL RIGHTS ACTIONS**

55. The City has been aware for some time – from civil rights lawsuits, Notices of Claim, complaints filed with the Civilian Complaint Review Board ("CCRB"), City Council hearings, newspaper reports, criminal cases resulting in declined prosecutions and dismissals, and judicial

rulings suppressing evidence and finding officers incredible as a matter of law – that a disturbing number of NYPD officers unlawfully search and seize citizens without probable cause, bring charges against citizens with no legal basis, perjure themselves in charging instruments and through testimony, and fail to intervene in and report the obviously illegal actions of their fellow officers.

56. It is well documented that the number of claims against the NYPD has doubled in recent years and has cost taxpayers more than $1 billion.[1] Despite these staggering figures, the City has repeatedly resisted attempts to catalog even the most basic information gleaned from civil rights lawsuits that could improve training, leadership, supervision, and discipline in the NYPD. Although certain police officers, units, and precincts have been found to have violated New Yorkers' constitutional rights *repeatedly*, the City refuses to track the data.[2]

57. Courts – including this nation's highest court – assume that civil rights lawsuits deter police misconduct. *See Wyatt v. Cole*, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to

---

[1] *See* Barry Paddock, Rocco Parascandola, John Marzulli, & Dareh Gregorian, *Exclusive: Detective is NYPD's most-sued cop, with 28 lawsuits filed against him since 2006*, N.Y. DAILY NEWS, Feb. 16, 2014, http://www.nydailynews.com/new-york/lawsuits-nypd-double-decade-costing-taxpayers-1b-article-1.1615919#ixzz2ttdX4ZkE (reporting that the number of claims against the NYPD doubled between 2004-2014, to a record high of 9,570 lawsuits filed in 2012, costing taxpayers nearly $1 billion); Colleen Long & Jennifer Peltz, Associated Press, *Nearly $1B in NYC police payouts*, Yahoo! News (October 14, 2010, 7:44 PM), http://news.yahoo.com/ap-investigation-nearly-1b-nyc-police-payouts.html (reporting that, in the decade ending in 2010, the City paid out nearly one billion dollars to resolve claims against the NYPD); Caroline Bankoff, *The City Has Paid Almost Half a Billion Dollars in NYPD-Related Settlements Over the Past 5 Years*, NYMag.com, Oct. 12, 2014, http://nymag.com/daily/intelligencer/2014/10/428-million-in-nypd-related-settlements-paid.html (reporting that, between 2009-2014, New York City paid out more nearly $500 million to settle NYPD-related cases); see also City of New York, Office of the Comptroller Claims Report FY 2012, 30, June 4, 2013, https://www.documentcloud.org/documents/1375759-fy-2012-claims-report.html (noting that, in fiscal year 2012, so-called "police action claims," which are claims that result from false arrest or imprisonment, police shootings, excessive use of force, assault, or failure to protect, cost the City $64.4 million, and that in fiscal year 2011, the City paid out $60.2 million in police action claims).

[2] *See, e.g.*, Barry Paddock, et al., *Exclusive: Detective is NYPD's most-sued cop, with 28 lawsuits filed against him since 2006*, N.Y. DAILY NEWS, Feb. 16, 2014, http://www.nydailynews.com/new-york/lawsuits-nypd-double-decade-costing-taxpayers-1b-article-1.1615919#ixzz2ttdX4ZkE ("The [Daily] News' investigation was centered around the results of a Freedom of Information Law request for a list of lawsuits filed against officers who have been sued 10 or more times over the past decade. The city Law Department provided the names of 51 officers and 463 cases. A News search found an additional 146 cases against the officers, and four other officers who should have been included in the response — calling into question the city's ability to track these cases.").

deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.") (citing *Carey v. Piphus,* 435 U.S. 247, 254-257 (1978)); *Hudson v. Michigan*, 547 U.S. 586, 598 (2006) ("As far as we know, civil liability is an effective deterrent [to civil rights violations], as we have assumed it is in other contexts.") (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001) and *Nix v. Williams,* 467 U.S. 431, 446, (1984)).

58. However, because the City of New York refuses to track civil rights lawsuits, such suits do not serve the deterrent purpose envisioned by the Supreme Court.  By failing to keep track of this crucial data – which could save lives as well as taxpayer money – the City has created a system in which official misconduct is severed from any potential deterrent.

59. Further, the City has no procedure to notify individual officers or their supervisors of judicial findings that officers have violated the Constitution or testified incredibly.  Without this notification, improper search and seizure practices and incredible testimony go uncorrected, problematic supervision or leadership at the precinct level goes ignored, and repeated misconduct by individual officers goes unaccounted for.

**THE CITY FAILS TO HOLD POLICE OFFICERS PERSONALLY FINANCIALLY LIABLE, RESULTING IN A COMPLETE LACK OF ACCOUNTABILITY**

60. The City of New York is also liable in this case because, by habitually indemnifying police officers who have acted unconstitutionally, the City isolates such officers from accountability.[3]  The effect – yet again – is that civil rights lawsuits do not serve a deterrent purpose.  "It is almost axiomatic that the threat of damages has a deterrent effect, *surely particularly so when the individual official faces personal financial liability*." *Carlson v. Green*,

---

[3] *See* Eric Jaffe, *When Cops Violate Civil Rights, It's City Taxpayers Who Pay*, CITYLAB, Dec. 4, 2014, http://www.citylab.com/crime/2014/12/when-cops-violate-civil-rights-its-city-taxpayers-who-pay/383419/ (reporting that taxpayers almost always satisfy both compensatory and punitive damages awards entered against police officers).

446 U.S. 14, 21, (1980) [emphasis added] (citing *Imbler v. Pachtman*, 424 U.S. 409, 442 (1976)) [footnote omitted].

61. Furthermore, civil rights lawsuits against NYPD officers have no impact on the officers' careers, regardless of the expense to the City to defend a police misconduct case, and even when the same officers are named in multiple lawsuits, because settlements of civil claims are ordinarily not even noted in an officer's personnel file.[4]

62. For decades, the City has been on notice that certain officers and precincts are disproportionately responsibility for civil rights lawsuit liability.  Nonetheless, the City has failed to take action to hold officers or precincts accountable, and has failed to investigate to what extent certain officers, units, and precincts are disproportionately responsible.

63. In 1999, Comptroller Alan Hevesi, in a memo to Police Commissioner Howard Safir, stated that there was "a total disconnect" between the settlements of civil claims – even substantial ones – and NYPD discipline of officers.[5]  Hevesi continued:

> As a result, the NYPD does not learn of potential problem officers, fails to take curative action, and not infrequently fosters a situation in which an officer will engage in another act of violation, resulting in harm to another person and further damages from the City. More important, study of a large number of cases might well reveal patterns of misconduct against which the NYPD could and should take systematic management action.[6]

64. The Comptroller recommended that the police department "analyze . . . settled claims, and take steps to review the officers' performance and propensity to commit acts of excessive

---

[4] Association of the Bar of the City of New York, Committee on New York City Affairs, "The Failure of Civil Damages Claims to Modify Police Practices, and Recommendations for Change,"  March 2000, *available at* http://www2.nycbar.org/Publications/reports/print_report.php?rid=32.
[5] *Id*.

[6] *Id*.

force."[7]

65. Needless to say, the City has not heeded Hevesi's advice, and the "total disconnect" remains fully in place today. The pattern is now all too familiar: the City pays vast sums of money to resolve cases where New Yorkers' constitutional rights have been violated, while the NYPD does nothing to financially incentivize its officers to change their behavior, and fails to investigate or address the underlying causes of such violations.

**THE CITY FAILS TO DISCIPLINE ITS OFFICERS, THUS ALLOWING UNLAWFUL BEHAVIOR TO GO UNCHECKED**

66. The City is liable because it has created a legal system in which officer misconduct routinely goes unpunished.

67. The City has purported to attempt to address police officers' abuse of authority, in part through the creation of the CCRB, a police oversight agency with investigative powers.

68. However, the CCRB has proved vastly inadequate.

69. First, the CCRB fails in its mission because it often finds complainants "lack credibility" based on the fact that the complainant has also brought a civil rights lawsuit. The result is that the CCRB often fails to substantiate some of the most serious allegations.

70. Second, when the CCRB has determined that officers have made false statements to the CCRB in their own defense, the CCRB virtually never initiates its own findings against those dishonest officers. The same is true in situations where the CCRB finds that officers have failed to report their fellow officers' misconduct.

71. Third, because the CCRB's penalty recommendations are purely advisory and there is no enforcement mechanism, the recommendations have no binding effect on the NYPD or its officers. Even when the CCRB substantiates complaints, the police department rarely imparts its

---

[7] *Id*.

own discipline on the officer, and often simply drops the complaints.[8]

72. Fourth, the NYPD Department Advocate, which is endowed with the responsibility of following up on substantiated CCRB charges, is understaffed and under-utilized. Furthermore, in the rare event that the CCRB substantiates a complaint and the Department Advocate proves the case in an internal trial against an officer, the police commissioner still maintains the power to reduce the discipline against such an officer, a power the commissioner often wields.

73. Despite an apparently elaborate set of oversight mechanisms, the complaint procedure provides seemingly countless opportunities for City agencies to dismiss or disregard legitimate, credible complaints.

74. Due to the failures of the CCRB, many abuses of authority by police officers go unreported. Officers are thus free to abuse their authority with little or no fear of repercussions.

75. Here, the lack of accountability contributed to the defendant police officers' actions described above in that the officer defendants knew they were insulated from any repercussions for their unlawful actions against Plaintiffs.

**THE CITY HAS ENCOURAGED UNCONSTITUTIONAL STOPS THROUGH ITS USE OF ARREST QUOTAS**

76. The City has also been alerted to the regular use of stop, question, and frisk by its police officers, which disproportionately target people of color, despite the lack criminal evidence that such police intrusion actually produce, and despite the humiliation, inconvenience, and constitutional violations that the majority of law-abiding people, mostly in communities of

---

[8] *See* Nathan Tempey, *CCRB: Cop Who Shoved Kid Through Hookah Bar Window Used Excessive Force*, gothamist, July 28, 2015, http://gothamist.com/2015/07/28/bronx_hookah_window_ccrb.php (reporting that in 2014, the CCRB substantiated only 327 of nearly 5,000 complaints, and that the NYPD disciplined 10 2 officers in that same period. Of the officers disciplined, only 22 faced administrative charges); WNYC.org, *Police Punishment: CCRB vs NYPD*, http://project.wnyc.org/ccrb/ (last visited July 23, 2015) (reporting that, in 2012, police officers received no discipline in 104 cases (40.3%) of the substantiated complaints processed (258); in 2013, the NYPD dropped 28.3% of the substantiated complaints without any disciplinary action; in 2014, it dropped 24.5%).

color, suffer as a result.

77. Even as the use of stop, question, and frisk has declined precipitously in recent years – in large part due to the federal class action lawsuit *Floyd, et al. v. City of New York, et al.*, 08-CV-1034 (SAS) – the police have continued to use the policing tactic in a severely racially disproportionate manner, and for the improper purpose of meeting "performance goals" (more commonly known as arrest quotas).

78. According to data collected by the New York Civil Liberties Union ("NYCLU"), in 2014, New Yorkers were stopped by the police 46,235 times. Of the people stopped: 38,051 were totally innocent of any crime (82%); 24,777 were Black (55%); 12,662 were Latino (29%); and 5,536 were white (12%).[9]

79. The City is also aware that the misconduct does not stop at the regular use of stop and frisks to violate the civil rights of innocent people. For example, the NYCLU reported that more than 85% of summonses for Open Container were given to Black and Latino New Yorkers, whereas white recipients made up merely 4%.[10] The grossly disproportionate issuance of summonses to New Yorkers of color led one Kings County judge to note that he could not recall ever having arraigned a white defendant on an open container charge.[11]

80. Police officers have repeatedly told New York City news investigations that their supervisors pressure them into reaching "performance goals," resulting in the violation of

---

[9] *See* NYCLU, *Stop and Frisk Campaign: About the Issue*, http://www.nyclu.org/content/stop-and-frisk-data (last visited July 22, 2015).

[10] See NYCLU, *Testimony Before City Council Public Safety & Courts and Legal Services Committees On Summons Court Operations and Impact*, http://www.nyclu.org/content/testimony-city-council-public-safety-courts-and-legal-services-committees-summons-court-oper.

[11] *People v. Figueroa*, 36 Misc.3d 605, 608 (Kings Co. 2012).

innocent New Yorker's civil rights.[12]

81. The City's inability to prevent its officers from abusing the stop and frisk policy is emblematic of the City's continuing failures to exercise adequate control over the NYPD, and to prevent police officers from abusing their authority. Such failures have led to further abuse of authority by police officers, including the incident underlying Plaintiffs' Complaint.

82. All of the aforementioned has created a climate where police officers and detectives lie to prosecutors and in police paperwork and charging instruments, and testify falsely, with no fear of reprisal. As one the Honorable Jack Weinstein, United States District Court Judge of the Eastern District of New York, has written:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration—through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department—there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

*Colon v. City of New York*, No. 09-CV-8, 2009 WL 4263362, at *2 (E.D.N.Y. Nov. 25, 2009).

83. The City is aware that all of the aforementioned has resulted in violations of citizens' constitutional rights. Despite such notice, the City has failed to take corrective action. This failure and these policies caused the officers in the present case to violate Plaintiffs' civil rights, without fear of reprisal.

---

[12] *See* Jim Hoffer, *NYPD Officer Claims Pressure to Make Arrests*, WABC News ( (Mar. 2, 2010, 10:37 PM), http://7online.com/archive/7305356/ and Jim Hoffer, *Kelly Responds to Our NYPD Quotas,* WABC News (May 25, 2010, 3:31 PM), http://7online.com/archive/7461355/.

84. Plaintiffs have been damaged as a result of the City's deliberate indifference.

## FOURTH CAUSE OF ACTION
### FALSE ARREST & ILLEGAL IMPRISONMENT

85. The above paragraphs are here incorporated by reference.

86. Defendants subjected Plaintiffs to false arrest, false imprisonment, and deprivation of liberty without probable cause.

87. Defendants intended to confine Plaintiffs, Plaintiffs were conscious of their confinement, and did not consent to their confinement.

88. Defendants, their officers, agents, servants and employees, were responsible for Plaintiffs' arrest, detention and imprisonment during this period of time.

89. As a direct and proximate result of the misconduct and the abuse of authority detailed above, Plaintiffs sustained the damages described above.

## FIFTH CAUSE OF ACTION
### ASSAULT & BATTERY

90. The above paragraphs are here incorporated by reference.

91. By seizing, approaching, intimidating, questioning, and forcibly grabbing and handcuffing Plaintiffs, Defendants made Plaintiffs fear for their physical well-being and safety and placed them in apprehension of immediate harmful and offensive touching.

92. Defendants engaged in and subjected Plaintiffs to immediate harmful and offensive touching and battered them without their consent.

93. Defendants, their officers, agents, servants and employees, were responsible for Plaintiffs' arrest, detention, and imprisonment during this period of time.

94. As a direct and proximate result of the misconduct and the abuse of authority detailed above, Plaintiffs sustained the damages described above.

## **SIXTH CAUSE OF ACTION**
RESPONDEAT SUPERIOR

95. The above paragraphs are here incorporated by reference.

96. Defendants' tortious acts were undertaken within the scope of their employment by defendant City of New York and in furtherance of the defendant City of New York's interest.

97. As a result of Defendants' tortious conduct in the course of their employment and in furtherance of the business of defendant City of New York, Plaintiffs were damaged.

WHEREFORE, Plaintiffs demand judgment against the Defendants, jointly and severally, as follows:

A. In favor of Plaintiffs in an amount to be determined by a jury for each of Plaintiffs' causes of action;

B. Awarding Plaintiffs punitive damages in an amount to be determined by a jury;

C. Awarding Plaintiffs reasonable attorneys' fees, costs and disbursements of this action; and

D. Granting such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED:   August 4 , 2015
         Brooklyn, New York

                                        Respectfully submitted,

                                        */s/ Amy Robinson*

TO:   City of New York                              Amy Robinson, Esq.
      Office of Corporation Counsel                 Stoll, Glickman & Bellina, LLP
      100 Church Street                             475 Atlantic Ave., 3rd Floor
      New York, NY  10007                           Brooklyn, NY  11217
                                                    (718) 852-3710
      Officer Mohamed Mohamed #18337                arobinson@stollglickman.com
                                                    *Attorney for Plaintiffs*
      Officer James Paris

      Officers John Doe #1-5

18